## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br> v.<br><br>SYDNEY ALEXIS JOHNSON (1)<br>BRANDON THOMAS MARION (2),<br><br>  Defendant. | Case No.:  **26MJ2857**<br><br>COMPLAINT FOR VIOLATION OF<br><br>Title 18, U.S.C., Sec. 545 – Importation Contrary to Law (Felony) |

The undersigned complainant, being duly sworn, states:

On or about May 3, 2026, within the Southern District of California, defendants Sydney Alexis JOHNSON and Brandon Thomas MARION, did knowingly import merchandise, to wit: eleven (11) orange-fronted parakeets (*Eupsittula canicularis*) and sixteen (16) white-fronted Amazon parrots (*Amazonia albifrons*), contrary to law, that is, Title 16, United States Code, Sections 1538(c) and 1540(b), in violation of Title 18, United States Code, Section 545.

The complainant states that this complaint is based on the attached Statement of Facts incorporated herein by reference.

_____
Ian MacLean, Special Agent
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, on May 18, 2026.

_____
HON. DANIEL E. BUTCHER
U.S. MAGISTRATE JUDGE

## STATEMENT OF FACTS

1.    According to Customs and Border Protection reports, on May 3, 2026, at approximately 6:55 AM, Sydney Alexis JOHNSON and Brandon Thomas MARION, both United States citizens, applied for entry into the United States from Mexico through the San Ysidro Port of Entry. JOHNSON was the driver and registered owner of a 2003 Volkswagen Jetta ("the vehicle") bearing California license plates. MARION was the passenger in that vehicle.

2.    A CBP officer received two negative Customs declarations from JOHNSON. The officer observed that neither JOHNSON nor MARION were in possession of passports. JOHNSON and MARION informed the officer that they were born in the United States. The officer received a computer-generated alert and referred the vehicle for further inspection.

3.    A CBP officer operating the Z-Portal X-Ray machine detected anomalies in the spare tire of the vehicle, which was inside the trunk. The officer inspected the spare tire and heard a screeching noise. The officer observed birds inside the spare tire. The officer called for assistance and the vehicle continued to the Vehicle Secondary Lot for further inspection.

4.    In the Vehicle Secondary Lot, CBP Officers and Agricultural Specialists inspected the spare tire area of the vehicle, which led to the discovery of approximately 27 birds inside the spare tire, which had been outfitted with a cage, as shown below. Twenty-six of the birds appeared to be alive and one bird appeared to be deceased. A Wildlife Inspector from U.S. Fish and Wildlife Service responded to care for the birds, along with the Agricultural Specialists who had removed the birds from the vehicle. According to the Wildlife Inspector, a preliminary inspection indicated that the birds appeared to be 16 white-fronted Amazon parrots (*Amazona albifrons*) and 11 orange-fronted parakeets (*Eupsittula canicularis*). According to U.S. Fish and Wildlife agents, white-fronted Amazon parrots and orange-fronted parakeets are both protected under

1

Appendix II of the Convention on International Trade in Endangered Species of Flora and Fauna ("CITES").



*27 captive birds trapped inside cage made from a spare tire.*

5.    During the inspection of the vehicle in the Vehicle Secondary Lot, CBP officers instructed JOHNSON and MARION to exit the vehicle and handcuffed both individuals. During that interaction and during the inspection of the vehicle, according to preliminary reports from CBP, officers heard MARION state "that's a cage" when referring to the spare tire outfitted with a cage while laughing and that "the birds are mine, she is not involved." While a pat down was being conducted in the Security Office of the San Ysidro Port of Entry, officers heard MARION repeat that the birds were his.

While he was being fingerprinted, an officer heard MARION state that the person he was traveling with had nothing to do with the situation.

6.    During a post-*Miranda* interview, MARION said that he had paid an acquaintance between about $300 to $400 for the birds. MARION said his acquaintance helped him load the spare tire cage containing the birds into JOHNSON's vehicle. He stated the makeshift spare tire cage would be dark and calming for the birds. He further stated that the birds screeched when they were moved, describing the noise as a "pterodactyl screech." MARION said that he planned to sell the birds in the future to make money. He admitted that he knew he could be fined if the birds were detected, and that the birds could be seized, but he claimed he did not know he was doing anything criminal. MARION said he did not get a chance to declare the birds at the Primary Inspection Booth.

7.    During a post-*Miranda* interview, JOHNSON said she and MARION traveled to Mexico to gamble and have dinner. JOHNSON denied knowledge that the birds were in the vehicle but said she thought she did hear screeching or screaming noises coming from the trunk while driving. Additionally, she stated that she thought she heard faint noises coming from the trunk when she stopped at a gas station after leaving the casino and prior to returning to the United States.

8.    On May 5, 2026, the 26 live birds seized on May 3, 2026, were flown to the United States Department of Agriculture's Animal Import Center in Rock Tavern, New York, for quarantine. One bird did not survive transit, and two birds died in quarantine.

//
//
//
//
//
//
//

3



*One of the birds after receiving care from U.S. Fish and Wildlife Service*



*One of the birds after receiving care from U.S. Fish and Wildlife Service*

4



*One of the birds after receiving care from U.S. Fish and Wildlife Service*

9. JOHNSON and MARION were issued Notices to Appear citing Title 18, United States Code, Section 545 (smuggling goods into the United States and importation contrary to law), with a court date of May 18, 2026.

**LEGAL FRAMEWORK**

10. CITES is an international agreement among approximately 183 governments, including the United States and Mexico, to protect fish, wildlife, and plants that may become threatened with extinction. CITES establishes import and export restrictions to protect these species from overexploitation through international trade. Under CITES, species are protected according to a classification system known as "appendices." International trade in species listed in these appendices is monitored and regulated by permits and quotas. The permit restrictions apply to live and dead specimens and skins, parts, and products made in whole or in part from a listed species. The Endangered Species Act prohibits any person subject to the jurisdiction of the United States from engaging in any trade or possessing any specimens contrary to the provisions of CITES. 16 U.S.C. §1538(c)(1).

11.     Wildlife and plant species listed in Appendix I of CITES are threatened with extinction. Those listed in Appendix II of CITES include species not presently threatened with extinction but may become so if their trade is not regulated. Appendix II species may be allowed in trade but are strictly regulated and monitored. To import an Appendix II species into the United States, the exporter must obtain a valid "foreign export permit" issued by the specimen's country of origin before importation. Appendix III of CITES includes wildlife and plant species listed by CITES member countries as requiring international trade controls to prevent unsustainable or illegal exploitation of the species.

12.     Pursuant to the federal regulations implementing CITES, an official CITES document is required to accompany all wildlife imports or exports of a species listed on a CITES Appendix. For imports from Mexico of a species listed on Appendix II, a CITES export permit from Mexico is required. 50 C.F.R. §23.20(e). According to U.S. Fish and Wildlife databases, MARION and JOHNSON did not obtain any CITES permit to import the 27 birds.

13.     In addition, to import many types of wildlife, the wildlife must be subject to quarantine before it can be introduced into the United States. Many animals have diseases that can be transferred to humans (zoonotic diseases) or other animals that can have disastrous health effects to human or animal populations. For example, birds can carry and spread Avian influenza (bird flu), psittacosis, and histoplasmos. Bird flu is highly contagious and can cause flu like symptoms, respiratory illness, pneumonia and death in humans and other birds including birds raised in United States poultry farms. There are many other diseases that can be transmitted from different animals and have disastrous effects, that is why it is necessary to quarantine animals entering the United States to limit and safeguard against this potential disease transmission.